[See Case No. 15,132.]

## Case No. 4,945.

### FORRESTIER v. BORDMAN.

[1 Story, 43; 2 Law Rep. 325; 1 Hunt. Mer. Mag. 506.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1839.

[1] [Reported by William W. Story, Esq. 1 Hunt. Mer. Mag. 506, contains only a condensed report.]

C. P. Curtis, for plaintiff,

S. Hubbard and Willard Phillips, for defendant.

STORY, Circuit Justice (summing up to the jury). The first point made at the bar is, that Williams, the supercargo, had no authority to carry the flour to Batavia and to sell it there, under the terms of his instructions. The voyage contemplated was to several ports of South America, where it was supposed, that the flour might and would be sold, and from hence the vessel was to proceed to India, for a return cargo. Certainly the instructions, in their terms, did not con-

template any other event than a sale of all the flour at some one or more of the South American ports. It turned out, however, that the flour could not all be sold at the South American ports, or at least not sold, unless at an enormous sacrifice. The parties had not looked for any such event. What then was it the duty of the supercargo to do, in such a case of unexpected occurrence, not within the contemplation of the instructions? Was he to sacrifice the flour, or throw it overboard? No one pretends, that it was intended to be brought back again to the United States under any circumstances. It would probably have been spoiled and ruined on the return voyage, and come home utterly worthless. Now, I take it to be clear, that if by some sudden emergency, or supervening necessity, or other unexpected event, it becomes impossible for the supercargo to comply with the exact terms of his instructions, or a literal compliance therewith would frustrate the objects of the owner, and amount to a total sacrifice of his interests, it becomes the duty of the supercargo, under such circumstances, to do the best he can, in the exercise of a sound discretion, to prevent a total loss to his owner; and if he acts bonâ fide, and exercises a reasonable discretion, his acts will bind the owner. He becomes, in such a case, an agent from necessity for the owner. Suppose, for example, that a cargo of a perishable nature is shipped on a voyage, and is to be carried to a particular port of destination, and there sold, and the ship should in the course of the voyage meet with a storm, which should disable her, and she should go into a port of necessity to refit; and that the cargo should be found so much damaged, that the whole must perish before her arrival at the port of destination; would not the supercargo have a right to sell it there, in order to prevent a total loss, although no such case was contemplated in his orders? Certainly he would have a right to sell; and indeed it would become his duty, under such circumstances, to sell. In truth, in all voyages of this sort, there is an implied authority to act for the interest and benefit of the owner in all cases of unforeseen necessity and emergency, created by operation and intendment of law. I shall put it to the jury to say, therefore, whether the carrying the flour to Batavia, and selling it there, was not an act of necessity to prevent a total loss to the owner. If it was, then the supercargo was justified in directing the sale.

But, in the present case, the flour was actually sold and the proceeds thereof invested in coffee, which came home in the Shylock, and was received by the owner in Boston, without objection, with a full knowledge of all the circumstances, and sold on his own account. Now, I put it to the jury, whether this was not a complete ratification and confirmation of the sale. If the owner did not mean to ratify the sale, it was his duty at that time to have made his objections. He made none; and I put it to the jury to say, whether, having received the coffee, he ought now, at this distance of time, to be permitted to say, that he never meant to ratify the sale. Are his acts reconcilable with any supposition but that of an intentional ratification of the sale, even if unauthorized by necessity? Then, was the sale at Batavia a sale on credit at the risk of Forrestier, or of the defendant? We see, that no del credere or guaranty commission was in fact charged by Forrestier; and, therefore, it is not to be presumed, that the sale was at his sole risk, unless the other circumstances warrant the presumption, that it was so understood and intended between the supercargo and Forrestier.

And here the first point, which meets us, is, whether a sale on credit by Forrestier was authorized. That depends upon the usage of trade at Batavia. If it is the usage of trade there to sell for cash or upon credit, according to the discretion of the factor or commission merchant employed in the business, and the factor or merchant does sell upon credit, in the exercise of his discretion, then I take it, that the owner is bound by the sale, and the sale is at his risk, unless he can show, that there was some restriction imposed by himself, or by the supercargo, requiring a sale for cash. In every sale on credit, justified by the usage of the trade, the sale is at the risk of the owner, and not of the factor, unless the latter receives a guaranty commission, or the agreement of the parties, or the usage of the trade, makes the sale at the risk of the factor, or the risk is voluntarily taken by him. Now, in the present case, it seems to me, that the evidence clearly shows, that a sale upon credit is justified by the usage of trade at Batavia. But that I shall leave as a matter of fact for the jury to decide. The evidence seems also to establish, that sales on credit in this trade, like sales on credit in our home trade, are ordinarily at the risk of the owner. At least there is no determinate evidence, (as I understand it,) showing a contrary usage. But that I shall also leave for the consideration of the jury. Then, was any restriction imposed upon the factor in this case as to selling upon credit? No express restriction is pretended. The supercargo does not pretend to have given any. All he says is, that he directed Forrestier to sell and to hold the proceeds subject to his orders, to be invested, as he should direct. He does not pretend, that he directed the sale to be for cash only. Now, certainly, if the usage at the port was to sell for cash or credit, at the discretion of the factor, and he received orders to sell generally, he might fairly presume, that he was authorized to sell either for cash or credit, as would be most for the benefit of his employer. The flour was damaged. It might bring more upon a credit than upon a cash sale; and

thus a credit sale, although the proceeds were to be invested in a return cargo, might by a discount or advance pro tanto, be more for the benefit of the owner, than a cash sale. The question, therefore, for the jury to decide is, whether Forrestier did, by a sale on credit, violate his orders, or act contrary to his duty, so as to make that sale at his own risk.

It is said, that as the supercargo was in the port at the time, Forrestier ought to have consulted him, before he sold on credit. But why should he do so, if he had no knowledge, that the supercargo wished a sale for cash, or wished to be consulted before a sale on credit? The supercargo was a very young man, utterly unacquainted with the trade; and this was his first voyage. It will be for the jury to say, under such circumstances, whether it was the duty of Forrestier to consult him before the sale on credit, or not. There is no usage of trade shown, which requires such a consultation. Then it is said, that the form and language of the account of sales show, that Forrestier took the note of Johannis to himself, and that the whole transaction was thus closed and settled. Now, this is a matter to be judged of by the jury. Does the language of the account import on its face, that the sale was at the risk of the shipper, and that he took the note to himself, advancing cash for the amount, deducting the discount for the time the credit was to run? If the language is equivocal, it is open to construction and interpretation from the known usage of merchants. Ordinarily, in the home trade of the United States, most, if not all the witnesses (as far as I recollect) say, that the like words and statements of account would not import, that the cargo was at the risk of the factor; but that it was at the risk of the owner. However, this is a point, upon which the jury must judge for themselves. Then come the statements of Mr. Barrell, the clerk of Forrestier, made to the supercargo, and to which the latter has testified. I admitted the evidence, but with some hesitation, and thought it proper to be submitted for the consideration of the jury. Now, as Forrestier was not present, unless Barrell had authority in this case, or in cases of this sort, to act and speak, and interpret for Forrestier, his declarations will not bind the latter. The first point, therefore, to be established is, whether Barrell had such authority. If the jury think he had not, then his declarations are of no importance in the cause. If Barrell had such authority, then the jury will consider all the circumstances, and decide, what credit ought to be given to those declarations compared with the other facts and circumstances of the case. If the jury are of opinion, that Barrell was authorized to speak for Forrestier in the premises, and they believe, that there is no mistake or misrecollection of the supercargo at this distance of time, (and he has certainly testified with great candor and fairness,) then it seems to me, that the evidence does show very strongly, if not conclusively, that Forrestier took the risk to himself of the sale on credit; and the present action is not maintainable. It is most unfortunate, that when the supercargo was, as he says, surprised at the sale on credit, which did not come to his knowledge until the day before he sailed on the return voyage, that he did not speak to Forrestier on the subject. If he had, the difficulty would probably have vanished; or at least, a full explanation could have been made. The supercargo seems to have acted under a strange delusion, that Barrell was a partner in the house. This was an entire mistake.

The next point in the case, (supposing the case to be otherwise with the plaintiff,) is, whether there has been any negligence on the part of Forrestier in not making a demand of Johannis at the maturity of the note, or subsequently in not collecting it from him if then unpaid. It does not appear exactly when Johannis failed. He was in good credit, when the sale was made, (in November, 1830,) and his failure must have been before September, 1831; for he then absconded, the note having become due in the preceding May. The case is left imperfect in this respect. If the note might have been paid, or secured in May, and Johannis was not then insolvent, and the money has been lost by the negligence of Forrestier in not demanding payment or getting security, then he is not entitled to recover. But if Johannis was then insolvent, and unable to pay the note, I do not know, that there was any absolute obligation on Forrestier to institute a suit against Johannis for the recovery of the amount of the note. He was bound to exercise a sound discretion in this respect; and ought not to sue, or put the owner to expense, unless he had some reasonable ground to believe, that a suit would be productive of benefit to the owner. Then was Forrestier guilty of negligence in not giving earlier notice of his claim to the defendant, and of the insolvency of Johannis? Undoubtedly the notice ought to be given within a reasonable time. And if the defendant has suffered any damage or loss by its not being given within a reasonable time, the plaintiff must bear such loss or damage, to be deducted pro tanto from his claim. The letter containing notice was not sent until the 22d of December, 1832, and it reached Boston about May, 1833. Was there any change of circumstances of Johannis between May, 1831, and December, 1832, from which the defendant has suffered any injury or loss by the delay? The injury must decide this point upon the whole evidence.

Upon the whole, the case is submitted to the jury upon all these points; and they will apply the facts accordingly.

Verdict for plaintiff.